UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
REMUDA JET ONE, LLC, et al.,                        )
                                                    )
                   Plaintiffs,                      )
                                                    )
v.                                                  )        Civil Action No. 09-12029-LTS
                                                    )
CESSNA AIRCRAFT CO.,                                )
                                                    )
                   Defendant.                       )
_____)

ORDER ON DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT

November 16, 2012

SOROKIN, C.M.J.

Pursuant to Federal Rule of Civil Procedure 56, the defendant, Cessna Aircraft Company

("Cessna"), has moved for summary judgment (docket # 79) with respect to Counts I and II of the

Amended Complaint, and Count I of Cessna's Counterclaim.  Upon consideration of the parties'

memoranda and exhibits, and following oral argument, it is hereby ORDERED that the motion is

ALLOWED in part and DENIED in part, as set forth below.

I.        BACKGROUND

The plaintiffs are six Massachusetts limited liability companies – Remuda Jet One,

Remuda Jet Two, Remuda Jet Three, Remuda Jet Four, Remuda Jet Six, and Remuda Jet Ten

(collectively, "Remuda Jet") – formed to purchase six Cessna Mustang jets.  Doc. Nos. 81 & 92

at ¶¶ 1, 7.  Remuda Jet has three investors – Philip Greenspun, Thomas Cooper, and David Wihl

– each of whom is a pilot.  Id. at ¶¶ 2-3.  Greenspun manages Remuda Jet.  Id. at ¶ 1.  He also

manages Hanscom Charter LLC, which he formed with Cooper and hoped to operate as a charter

jet business that would lease airplanes from other owners, like Remuda Jet.  Id. at ¶ 4.

In December 2007 and January 2008, Greenspun, on behalf of Remuda Jet, signed purchase agreements for six Mustangs with expected delivery in late 2010 or early 2011.  Doc. No. 82-3 at Exs. 11-16, ¶ 1.  The total purchase price for each Mustang was $2,995,000.  Id. at ¶ 5.  Remuda Jet provided initial deposits of $175,000 per airplane with the signed purchase agreements.  Id. at ¶ 6(a); Doc. Nos. 81 & 92 at ¶¶ 8, 10.  Additional deposits were due from each Remuda Jet entity eighteen months and nine months before the anticipated delivery of each jet.  Doc. No. 82-3 at Exs. 11-16, ¶ 6(b)-(c).  Each purchase agreement contained the following "Purchaser's Default" provision:

> In the event this Agreement is breached or terminated by Purchaser for any cause whatsoever other than Seller's default, including Purchaser's failure to make all payments when due, then all deposits shall be retained by Seller not as a forfeiture but as liquidated damages for default and this Agreement shall end.

Id. at ¶ 12(a).

In April 2009, Greenspun and Wihl were informed by another pilot that a Mustang had experienced frozen flight controls, that Cessna had been unable to fix the problem, and that the owner of the jet had ultimately returned it to Cessna.  Doc. Nos. 81 & 92 at ¶ 28; Doc. No. 94-2 at 26.  The problem, which reportedly related to the plane's ailerons and elevator trim, was the subject of five Service Difficulty Reports ("SDRs") published in a Federal Aviation Administration ("FAA") database.  Doc. Nos. 81 & 92 at ¶ 29.  Greenspun and Wihl reviewed the SDRs and made their own inquiries with other pilots and jet owners, but found no other reported problems involving Mustangs.  Doc. No. 94-3 at 8; see also Doc. No. 94-4 at 32-33.

Although many facts are disputed regarding the communications with Cessna that

2

followed Remuda Jet's discovery of the SDRs, the parties agree on two things.  First, Greenspun

raised the frozen flight control problem with Cessna sales personnel and orally requested more

information.  Doc. Nos. 81 & 92 at ¶¶ 30-35.  Second, a local Cessna sales representative and a

regional sales manager informed Greenspun that only one Mustang had experienced the problem,

and that Cessna was working to identify the cause and engineer a solution.  Id.; Doc. No. 91 at

18.

Remuda Jet's second set of deposits – $100,000 per Mustang – were to be paid in June

and July of 2009.  Doc. Nos. 81 & 92 at ¶ 26; Doc. No. 82-6 at Ex. 35.  Before the deposits were

due, Greenspun wrote to a Cessna customer account manager and explained that Remuda Jet

would withhold further payments "until Cessna has, to our satisfaction, solved the [frozen flight

control] problems reported in [the five SDRs]."  Doc. No. 82-6 at Ex. 36.  Greenspun's letter

stated:

> Given the unprecedented nature of a modern jet at 33,000[ feet] being
> uncontrollable, we want to make sure that this problem is fully understood before
> we go forward . . . .  A second issue of concern is the impact that these incidents
> will have on our ability to attract customers.  Even if the flight control problem
> were to be solved eventually, customers may shy away from an aircraft perceived
> to be unsafe. . . .  We would like to know what Cessna is doing to reassure
> passengers that the Mustang is safe.

Id.  Greenspun went on to identify twelve categories of information he "need[ed] to evaluate the

situation."  Id.  In closing, he asked Cessna to "stop any work that [it] might be doing on the six

airplanes" Remuda Jet ordered, explaining that he would consider canceling the orders if

"Cessna's response to this request for information does not satisfy [Remuda Jet's] experts."  Id.

The parties have divergent views regarding the nature and adequacy of Cessna's response

to Greenspun's letter.  It is undisputed that Remuda Jet made no payments after the initial

deposits (which totaled $1,050,000), and that Cessna retained those deposits.  See Doc. Nos. 81

& 92 at ¶¶ 52-53; Doc. No. 82-6 at Ex. 44 (notifying Greenspun in September 2009 of Cessna's

decision to invoke the default provision of the purchase agreements).

      In November 2009, Remuda Jet sued Cessna, alleging breach of contract, invalid

liquidated damages, fraud, and unfair or deceptive acts in violation of Chapter 93A of the

Massachusetts General Laws.  Doc. Nos. 1, 62.  Cessna counterclaimed, seeking a declaration

that the liquidated damages provision in the purchase agreements was valid, and alleging breach

of contract by Remuda Jet.  Doc. No. 63.

      Cessna's pending motion seeks summary judgment only with respect to the claims and

counterclaims related to breach of contract and the validity of the liquidated damages clause.  See

Doc. Nos. 79-80.  Cessna asserts that Remuda Jet's failure to make the second deposits described

in the purchase agreements breached those agreements and triggered the liquidated damages

provision excerpted above, which Cessna argues is valid under Kansas law.[1]  Remuda Jet

disagrees, claiming a factfinder could conclude that Cessna repudiated the purchase agreements

by providing inadequate assurances in response to the insecurity expressed in Greenspun's June

2009 letter, and that the liquidated damages clause is void as a penalty.  For the reasons that

follow, Cessna's motion is allowed only insofar as it seeks a declaration that the liquidated

damages provision is valid.  In all other respects, the motion is denied.

II.    STANDARD OF REVIEW

      Summary judgment is appropriate only when "the movant shows that there is no genuine

---

[1]The parties agree that, pursuant to the terms of the purchase agreements, Kansas
substantive law applies here.  Doc. Nos. 81 & 92 at ¶ 13; Doc. No. 82-3 at Exs. 11-16, ¶ 19.

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  Once a party has properly supported its motion for summary judgment, the burden

shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading,

but must set forth specific facts showing there is a genuine issue for trial."  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); accord Barbour v. Dynamics Research Corp., 63 F.3d 32,

37 (1st Cir. 1995).  The Court is "obliged to view the record in the light most favorable to the

nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."

LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court must ignore

"conclusory allegations, improbable inferences, and unsupported speculation."  Sullivan v. City

of Springfield, 561 F.3d 7, 14 (1st Cir. 2009).

     "There must be sufficient evidence favoring the nonmoving party for a [factfinder] to

return a verdict for that party.  If the evidence is merely colorable or is not significantly

probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50.  "Trialworthiness

requires not only a 'genuine' issue but also an issue that involves a 'material' fact."  Nat'l

Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).  A material fact is one

which has the "potential to affect the outcome of the suit under applicable law."  Nereida-

Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).  For a factual dispute to be

"genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party

opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve

the issue in favor of either side."  Nat'l Amusements, Inc., 43 F.3d at 735 (internal citation

omitted).

III.     DISCUSSION

    A.     Breach of Contract

    The parties agree that the purchase agreements were valid, binding contracts.  Further, the undisputed facts establish that Remuda Jet failed to make payments as set forth in the purchase agreements.  That failure constituted a breach of contract, unless Cessna first repudiated the purchase agreements by failing to provide adequate assurances regarding aspects of the Mustangs' safety about which Remuda Jet was reasonably insecure.

    Under Kansas's Uniform Commercial Code:

> (1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired.  When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
>
>    *     *     *
>
> (4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

Kan. Stat. Ann. § 84-2-609.[2]  This provision excuses Remuda Jet's failure to satisfy its contractual obligations only if Remuda Jet can establish each of the following elements: 1) it "had reasonable grounds for insecurity regarding [Cessna's] performance under the contract"; 2) it "demanded in writing adequate assurance of [Cessna's] future performance"; and 3) it did "not receive[] from [Cessna] such assurance."  LNS Inv. Co. v. Phillips 66 Co., 731 F. Supp. 1484, 1487 (D. Kan. 1990); accord Hope's Architectural Prods., Inc. v. Lundy's Constr., Inc., 781 F.

---

    [2]Both the language of the Kansas statute and the comments following it are identical to the parallel provision in the Uniform Commercial Code.  See U.C.C. § 2-609.

Supp. 711, 715 (D. Kan. 1991).

The questions of reasonableness posed by these elements are typically reserved for the factfinder.  See By-Lo Oil Co. v. ParTech, Inc., 11 F. App'x 538, 539 (6th Cir. 2001); see also Remuda Jet Five LLC v. EMBRAER-Empresa Brasileira de Aeronautica, S.A., No. 10-cv-8369, 2012 WL 1142296, at *9 (Mar. 27, 2012) (collecting cases).  The reasonableness of a buyer's insecurity must be assessed based on the facts *as the buyer knew them* "after the contract was in place," By-Lo Oil Co., 11 F. App'x at 544, through the date it "invoked its rights under [§] 84-2-609," Hope's Architectural Prods., 781 F. Supp. at 715.  Although "a buyer who believes that the seller's deliveries have become uncertain [need not] wait for the due date of performance" to demand assurances, Kan. Stat. Ann. § 84-2-609, comment 1, the reasonableness of his insecurity depends, in part, on "whether time [is] running short for [him] to make alternative arrangements," By-Lo Oil Co., 11 F. App'x at 544.

Where reasonable grounds for insecurity exist, a buyer may demand "adequate assurance of due performance," Kan. Stat. Ann. § 84-2-609(1), but his demand "must be based upon reason and must not be arbitrary or capricious," id. at comment 4; see Hope's Architectural Prods., 781 F. Supp. at 716 (party making demands that are arbitrary, capricious, excessive, or not based upon reason may be deemed in breach); see also Remuda Jet Five, 2012 WL 1142296, at *10 ("A buyer cannot ask for reassurance regarding something that a seller has no contractual obligation to provide.").

Because Remuda Jet has identified genuine factual disputes regarding each of the elements identified above, Cessna is not entitled to summary judgment with respect to either

party's breach of contract claim.[3]  First, although it is undisputed that Remuda Jet learned in

April 2009 of aileron and elevator trim freezing one Mustang experienced while in flight, the

parties disagree about the manner in which Cessna addressed Remuda Jet's concerns about the

problems.  Initial discussions took place orally in April and May 2009, and any finding regarding

their content will depend, at least in part, on whether the Court credits testimony by Greenspun or

Cessna's sales personnel regarding what was said (and how it was said).  As such, the

reasonableness of Remuda Jet's insecurity when Greenspun authored his June 2009 letter seeking

assurances cannot be determined as a matter of law on the record as it now stands.[4]

Second, drawing all inferences in Remuda Jet's favor, Greenspun's letter sought

information from Cessna, at least some of which was aimed at addressing concerns regarding the

problem experienced by the Mustang that was the subject of the SDRs.[5]  Remuda Jet conceded at

_____

[3]The parties disagree regarding to what extent, and pursuant to which legal standard, Remuda Jet was required to conduct itself "in good faith."  Regardless of which standard is applied, an assessment of whether Remuda Jet was motivated – whether in whole or in part – by economic concerns and a desire to escape contractual obligations that had become financially burdensome is a matter to be resolved at trial.  See Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 677 (1st Cir. 1996) (questions of motive are typically reserved for the factfinder).

[4]Information revealed during discovery regarding Cessna's apparent awareness of similar problems occurring on other Mustangs, while relevant to Remuda Jet's fraud and Chapter 93A claims, will not impact an assessment of the first two elements under § 84-2-609, which depend on what Remuda Jet knew or reasonably believed in June 2009.  Similarly, Remuda Jet's assertion that it was subjectively dissatisfied with, or suspicious of, Cessna's oral assurances at the time they were given will justify a request for further assurances under the statute only if the dissatisfaction or suspicion was objectively reasonable.  See Kan. Stat. Ann. § 84-2-609, comment 4 (explaining the statute does not create a "purely personal" test that would find repudiation based on a party's "sole judgment, if for any reason he was dissatisfied" with the other party's assurances).

[5]Cessna suggests that the letter was not a "demand" for purposes of Kan. Stat. Ann. § 84-2-609 because Greenspun drafted it on Hanscom Charter letterhead, and did not write on behalf of the actual parties to the purchase agreements (i.e., Remuda Jet).  See Doc. No. 80 at 17; Doc.

oral argument that some of Greenspun's requests sought information in excess of that which reasonably and directly related to Remuda Jet's stated concerns.[6]  See, e.g., Doc. 82-6 at Ex. 36 (requesting "any information that Cessna has obtained about other problems with the Mustang that could affect the safety of flight").  However, any conclusion regarding to what extent Greenspun's letter sought "adequate assurances" and qualified as a request pursuant to § 84-2-609 will depend on the factfinder's determination of to what extent, if any, Remuda Jet's insecurity was reasonable (and to what extent the letter's requests related to "due performance" under the terms of the purchase agreements).  See Creusot-Loire Int'l, Inc. v. Coppus Eng'g Corp., 585 F. Supp. 45, 50 (S.D.N.Y. 1983) (reasonableness of demands assessed "in light of the circumstances").

Finally, like the scope of Greenspun's demand, the adequacy of Cessna's response will turn on the factfinder's determination regarding the reasonable level of insecurity.  The evidence demonstrates the customer account manager to whom Greenspun's letter was addressed sent a brief response within an hour of receiving the letter, a copy of a Service Bulletin related to one of the problems described in the SDRs was provided to Wihl and discussed with Greenspun sometime during the summer of 2009, and a formal written response to the letter was provided in September 2009.  The adequacy of these steps can be measured only after determinations are

---

No. 98 at 7.  Because UCC provisions like § 84-2-609 are generally construed liberally, see Pittsburgh-DesMoines Steel Co. v. Brookhaven Manor Water Co., 532 F.2d 572, 581 (7th Cir. 1976), and because there is no evidence Cessna was confused as to the intent of Greenspun's letter or the contracts to which it pertained, the formalistic approach urged by Cessna is inappropriate here.

[6]Cessna has cited no case – and the Court has discovered none – wholly absolving a party to a contract of its responsibility pursuant to § 84-2-609 to respond to the portion of a request for assurances that is reasonable, simply because other portions of the request are excessive.

made regarding the first two elements.

Accordingly, the proper application of § 84-2-609 and its impact on the parties' breach of contract claims cannot be assessed until the time of trial.

B.     Liquidated Damages

Both parties seek declarations regarding the validity of the liquidated damages provisions in the purchase agreements.  See Doc. No. 62 at 9-10; Doc. No. 63 at 13-14; Doc. No. 80 at 3-9. Assessing the propriety of a liquidated damages clause, like any matter of contract interpretation, is a legal question.  Carrothers Constr. Co. v. City of S. Hutchinson, 207 P.3d 231, 239 (Kan. 2009).  Under Kansas law, a liquidated damages clause is valid if it is reasonable.  Rodriguez v. Learjet, Inc., 946 P.2d 1010, 1013 (Kan. Ct. App. 1997).  Reasonableness is determined by considering the anticipated or actual harm caused by a breach, the difficulty of proving loss, and the difficulty of otherwise obtaining an adequate remedy.  Kan. Stat. Ann. § 84-2-718(1); see Rodriguez, 946 P.2d at 1013.  The Kansas Supreme Court has adopted a purely prospective analysis, rejecting the view that courts should "determine what actual damages resulted" from a breach, "and then compare those actual damages to the liquidated damages" set forth in the contract.  Carrothers Constr. Co., 207 P.3d at 242-43.  "[T]he burden of proving a liquidated damages clause is an unenforceable penalty falls on the party challenging the provision." Id. at 241.

At least two courts applying Kansas law have upheld liquidated damages clauses similar to the one at issue here.  In upholding a nearly identical clause in a 1989 purchase agreement for a different Cessna jet, the United States District Court for the District of Kansas permitted Cessna to retain deposits totaling ten percent of the purchase price, despite the fact that Cessna

successfully resold the aircraft at issue "for close to the price originally agreed to" by the

defaulting buyer.  Aero Consulting Corp. v. Cessna Aircraft Co., 867 F. Supp. 1480, 1493-94 (D.

Kan. 1994).  The court concluded the amount at issue "was not unreasonably large such that it

amounted to a penalty," further reasoning:

> The evidence showed that it was difficult to determine with certainty the actual
> damages associated with such a cancellation.  The calculation was complicated by
> the lengthy period of time required for production of such an aircraft and the
> uncertainties associated with supply, demand, and costs for such aircraft. . . . [I]n
> light of the nature of the production of aircraft and the costs associated with
> maintaining production, it would not be feasible for Cessna to otherwise obtain an
> adequate remedy.

Id. at 1494.  For the same reasons, the Kansas Court of Appeals upheld a similar provision in

Rodriguez, even though the original purchaser repudiated the contract nearly a year before the

scheduled delivery, and the manufacturer ultimately sold the jet at "a larger profit than [it] had

originally budgeted."  946 P.2d at 1012-13, 1015.[7]

Here, Remuda Jet's only objection to the liquidated damages clause is its assertion that

Cessna's actual damages were limited to a $14,500 sales commission, and that Cessna retained

the deposits "because it had no other way to remain profitable during the economic downturn in

2009."  Doc. No. 91 at 29-30.  Such claims are irrelevant to the prospective analysis required

under Kansas law.  The deposits at issue – $175,000 per jet – represent less than six percent of

the total purchase price under each purchase agreement.  The same difficulties described by the

Aero Consulting court with respect to assessing actual damages (let alone predicting them at the

---

[7]Although the Rodriguez court first determined the manufacturer was a "lost volume
seller" with actual damages including lost profits, it alternatively reasoned the liquidated
damages clause was valid in any event based on the same factors considered in Aero Consulting.
946 P.2d at 1014-15.

time the contracts were signed) and otherwise obtaining an adequate remedy for a breach apply

here with equal force.  867 F. Supp. at 1494.[8]

Accordingly, Cessna is entitled, as a matter of law, to a declaration that the liquidated

damages clause of the purchase agreements were valid and enforceable.

IV.    CONCLUSION

For the foregoing reasons, Cessna's Motion for Partial Summary Judgment (docket # 79)

is ALLOWED in part and DENIED in part.  Judgment is entered in favor of Cessna and against

Remuda Jet with respect to Count II of the Amended Complaint, as well as Count I of Cessna's

Counterclaim insofar as it seeks a declaration that the liquidated damages provision is valid.  In

light of this ruling, Count II of Cessna's Counterclaim, which sought actual damages, in the event

the liquidated damages clause were not upheld, see Doc. No. 63 at 14-15, is DISMISSED as

moot.  Thus, the matter will proceed to trial on Counts I, III and IV of Remuda Jet's Amended

Complaint, and the remainder of Count I of Cessna's Counterclaim.

SO ORDERED.

        /s / Leo T. Sorokin
Leo T. Sorokin
Chief United States Magistrate Judge

---

[8]At the motion hearing, Remuda Jet's counsel suggested the clause should be viewed as penal in nature because Cessna did not always invoke such clauses and, instead, refunded certain other buyers' deposits.  This argument, however, was not presented in Remuda Jet's brief, nor has Remuda Jet offered any evidence suggesting Cessna's decision to invoke the clause here was undertaken in bad faith or for an improper purpose.  Remuda Jet agrees Greenspun is a sophisticated businessman who understood the meaning of the clause and did not object to it when he signed the contracts.  As such, the simple fact that Cessna sometimes elected not to invoke its contractual rights does not render the clause an unenforceable penalty.